UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DAVID L. SANTISTEVAN,

                Petitioner,

    v.

JOHANNA SMITH, Warden,

                Respondent.

Case No. 1:11-cv-00319-REB

**MEMORANDUM DECISION AND ORDER**

Pending before the Court is Petitioner David L. Santistevan's Amended Petition for Writ of Habeas Corpus (Dkt. 25). Respondent has filed an Answer and Brief in Support of Dismissal (Dkt. 32). Petitioner has filed a reply brief entitled Traverse/Response to Motion for Dismissal of Amended Petition ("Traverse") (Dkt. 42). The Court takes judicial notice of the records from Petitioner's state court proceedings lodged by Respondent on January 25, 2012 (Dkt. 17).

The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c). (Dkt. 14.) Having carefully reviewed the record, including the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and

**MEMORANDUM DECISION AND ORDER - 1**

record and that the decisional process would not be significantly aided by oral argument. Therefore, the Court shall decide this matter on the written motions, briefs and record without oral argument. D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying the Amended Petition and dismissing this case.

## PRELIMINARY MOTIONS

The Court will grant Petitioner's Second Motion to Extend Time to File Traverse, as well as Petitioner's Amended Second Motion to Extend Time to File Traverse. Petitioner's Traverse (Dkt. 42) is deemed timely.

## BACKGROUND

On April 13, 2004, the State charged Petitioner with two counts of attempted second degree murder, with a sentencing enhancement for the use of a firearm, based on an incident in which Petitioner shot two people in an alley behind a bar in Bellevue, Idaho. (State's Lodging A-1 at 65-66; A-2 at 217-28.) The case proceeded to a jury trial, and Petitioner was found guilty as charged. (State's Lodging A-2 at 285-87.) The trial court sentenced Petitioner to a prison term of 11 years fixed on each of the attempted murder counts, to be served consecutively, and an indeterminate term of 13 years for a firearm enhancement, also to be served consecutively. (State's Lodging A-2 at 300-05; State's Lodging C-1 at 34.)

On direct appeal, Petitioner raised two issues: (1) whether his right to self-incrimination under the Fifth Amendment had been violated by a court-ordered

MEMORANDUM DECISION AND ORDER - 2

psychological examination with the State's mental health expert before trial; and (2) whether his right to claim a psychotherapist-patient privilege had been violated. (Dkt. 5-2 at 4.) The Idaho Court of Appeals concluded that these issues lacked merit, and it affirmed. (Dkt. 5-1 at 4-8.) Petitioner did not file a petition for review in the Idaho Supreme Court within the 21-day deadline, and his attempt to file a petition nearly two years later was denied. (State's Lodgings B-2 through B-8.) In a separate appeal, the Idaho Court of Appeals affirmed the denial of Petitioner's Rule 35 motion to reduce his sentences. (State's Lodging D-5.)

Petitioner next submitted an application for post-conviction relief in state district court. (State's Lodging E-1 at 6-9.) The court appointed counsel, who filed an amended petition on Petitioner's behalf raising numerous claims, including claims of ineffective assistance of trial and appellate counsel. (State's Lodging E-1 at 21-24, 164-73.) The court eventually granted the State's motion to dismiss, and the petition was dismissed without an evidentiary hearing. (State's Lodging E-2 at 372-405.)

Petitioner represented himself on appeal from the district court's post-conviction order. Among other issues, he argued that the district court had erred in summarily dismissing his ineffective assistance of counsel claims, but the Idaho Court of Appeals concluded that "as to most of his claims[,] he points this Court to no evidence in particular that would have created a genuine issue of material fact precluding summary dismissal." (Dkt. 6 at 3.) Because of this deficiency, the Court of Appeals did not reach

**MEMORANDUM DECISION AND ORDER - 3**

the merits of "any of [Petitioner's] claims for which he has presented no more specific argument," finding those issues to be waived. (*Id*.) Instead, the Court of Appeals addressed only whether Petitioner's counsel was ineffective in (1) conceding the weapons enhancement charge during the criminal trial, (2) failing to file a petition for review with the Idaho Supreme Court during the direct appeal and the Rule 35 proceedings, and (3) failing to introduce a medical report and medical testimony at the trial. (Dkt. 6 at 5-7.) Finding no merit to these or any other issues, the Idaho Court of Appeals affirmed the district court. (*Id*. at 9.) Petitioner filed a petition for review in the Idaho Supreme Court, which was denied.  (State's Lodgings F-3, F-4.)

With the assistance of retained counsel, Petitioner submitted a Petition for Writ of Habeas Corpus in this Court on July 14, 2011, which he amended on August 24, 2011. (Dkts. 1, 4-1, 25.) In his Amended Petition, Petitioner alleges that he was deprived of the effective assistance of counsel on numerous grounds (Claim A); that he was denied his Fifth Amendment right against compelled self-incrimination on grounds related to his examination by two psychiatrists (Claim B); and that he was not afforded due process of law in the post-conviction matter because the trial court prohibited him from testifying (Claim C). (Dkt. 25 at 8-15.)

Respondent then filed a Motion for Partial Summary Dismissal (Dkt. 16), contending that all of the claims in the Amended Petition were procedurally defaulted except Subclaim A-1 and Claim B. (Dkt. 16.) The Court granted the motion in part and

**MEMORANDUM DECISION AND ORDER - 4**

denied it in part, dismissing Claim A-8 and Claim C but allowing the parties to address the applicability of *Martinez v. Ryan*, 131 S. Ct. 1309 (2012), to the remaining claims subject to the motion to dismiss. (Dkt. 27.) The Court concluded that Claims A-2 and Claim A-5 were not procedurally defaulted. (*Id.*)

After Petitioner notified the Court that he would not be making a *Martinez* argument (Dkt. 28), the Court dismissed Claims A-3, A-4, A-6, A-7, and A-9. (Dkt. 30.) Therefore, the only claims remaining to be addressed are Claims A-1, A-2, A-5, and B.

Claim A-1 alleges that Petitioner was denied his Sixth Amendment right to effective assistance of counsel when trial counsel conceded that Petitioner used a firearm during the attempted murder offenses, which allegedly denied him the right to a fair trial on the sentencing enhancement charge. (Dkt. 25 at 8.) Claim A-2 alleges that trial counsel was also ineffective for failing to submit a medical report and call a witness regarding Petitioner's injuries from a previous beating—not committed by Petitioner's two victims—to support his claim of self-defense. (*Id.* at 9.) Claim A-5 alleges ineffective assistance based on trial counsel's failure to inform Petitioner "about the process for seeking review from the Idaho Supreme Court," as well as his failure "to preserve a due process error alleged to have been made at sentencing." (*Id*. at 12.) Claim B alleges that Petitioner was denied his Fifth Amendment right not to be a witness against himself when—after Petitioner notified the government that he would be calling a psychiatrist as an expert witness to testify as to Petitioner's mental state on the night of the

**MEMORANDUM DECISION AND ORDER - 5**

shooting—the trial court ordered Petitioner to disclose the contents of Petitioner's

psychiatrist's expert report to the government and to submit to a psychological

examination by the government's expert.  Petitioner also claims his Fifth Amendment

rights were violated when the prosecutor cross-examined Petitioner about statements that

he made to his own psychiatrist and expert witness. (*Id*. at 14.)

## DISCUSSION

### 1.    Standard of Law

Federal habeas corpus relief may be granted on claims adjudicated on the merits in

a state court judgment when the federal court determines that the petitioner "is in custody

in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2254(a). A federal habeas court reviews the state court's "last reasoned decision" in

determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797,

804 (1991).

Under § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), federal habeas relief is generally limited to instances where the

state court's adjudication of the petitioner's claim

> (1)    resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

**MEMORANDUM DECISION AND ORDER - 6**

28 U.S.C. § 2254(d).

When a party contests the state court's legal conclusions, including the application of the law to the facts, § 2254(d)(1) governs. Section 2254(d)(1) has two clauses, each with independent meaning. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1) the petitioner must show that the state court, although identifying "the correct governing legal rule" from Supreme Court precedent, nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. The standard of § 2254(d) is onerous and is satisfied only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents."

**MEMORANDUM DECISION AND ORDER - 7**

*Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

Though the source of clearly established federal law must come from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). Circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

When a petitioner contests the reasonableness of the state court's factual determinations, a federal court must undertake a § 2254(d)(2) analysis. To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Because it does not appear that Petitioner is challenging any particular factual findings of the state courts, the Court treats the Amended Petition as a challenge to the state courts' legal analysis pursuant to § 2254(d)(1).

Importantly, a "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct. 841, 849 (2010).

**2.      Specific Factual Basis for Petitioner's Claims**

In January 2004, before the incident for which Petitioner was charged, Petitioner

**MEMORANDUM DECISION AND ORDER - 8**

was allegedly attacked and beaten at the Silver Dollar Bar in Bellevue, Idaho by both known and unknown assailants. He reported the attack to Sergeant Will Fruehling of the Blaine County Sheriff's Department, who told Petitioner that it would be difficult to pursue the case because "there were no marks on [Petitioner]." (Dkt. 7-3 at 21.) Petitioner then told Sergeant Fruehling that "it was more of a psychological beating" and that he did not "bruise easily." (*Id*.) After Petitioner learned that no charges would be pursued, Petitioner asked Sergeant Fruehling, "So if you're not going to do anything, what will happen if I go down there and shoot them?" (*Id*.) Frueling responded that it would not be good idea. (*Id*.) Although it is unclear how severe Plaintiff's physical injuries were as a result of the January attack, Petitioner visited Dr. Kathy Haisley four days afterwards, and her medical report states that Petitioner had multiple abrasions on his forearms and left knee, and that his knee was swollen and bruised. (Dkt. 7-12 at 1.)

The events giving rise to the attempted murder charges against Petitioner occurred two months later, in March 2004. The altercation between Petitioner and his two teenage victims began when the two boys were riding a four-wheeler toward Petitioner's car, which he was driving down a narrow road. The boys pulled over to let Petitioner pass. (Dkt. 7-6 at 8.) Petitioner was angry at the boys for being in his way and began yelling at them and threatening to call the police. (*Id.* at 19.) Later that same night, the boys saw Petitioner in an alley behind the Silver Dollar Bar—the same bar where Petitioner was beaten two months earlier. (*Id.* at 9.)

**MEMORANDUM DECISION AND ORDER - 9**

Petitioner stated that he was in the alley because he wanted to gather some information about his previous attackers. (*Id.* at 16.) When the boys arrived, Petitioner was writing down license plates of cars that were in the alley. One of the boys, Marshall Hooten, walked over to Petitioner to talk to him about what happened in the road earlier. (*Id.* at 8-9.) Hooten asked Petitioner what his problem was. (*Id.* at 4.) Petitioner, allegedly feeling threatened, reached into his car to retrieve his loaded pistol and—after firing a shot into the ground at Hooten's feet—shot Hooten in the gut.[1] (*Id.* at 5, 9-10, 17.) Petitioner then shot the other boy, Tyrel Peak, in the buttock as Peak was trying to ride away on the four-wheeler. (Dkt. 7-3 at 8.) Both of the boys were seriously injured but survived.

After the shooting, Petitioner drove home without checking to see if either boy was alive, called a girlfriend over to have sex, took a shower, and made tea. (Dkt. 7-7 at 21.) Petitioner confirmed that this was "a pretty normal evening between" him and the woman, April Kildare. (*Id.*) The police later found pieces of a dismantled gun near a bike path south of Petitioner's house. The gun was registered to Petitioner, the caliber matched that of the gun used to shoot Hooten and Peak, and the gun appeared to have been soaked in saltwater. (State's Lodging E-2 at 382; Dkt. 7-5 at 11-12; Dkt. 7-6 at 2.) Petitioner later

---

[1] Though Petitioner testified that he fired a warning shot into the air before he shot the ground at Hooten's feet, Hooten testified that Petitioner's first shot was into the ground. A defense witness testified that he thought he heard four gunshots the night of the shooting, but during the prosecution's rebuttal case, three witnesses testified that they heard only three shots—one at the ground and one for each victim. (Dkt. 7-7 at 18-19.)

**MEMORANDUM DECISION AND ORDER - 10**

claimed that he did not remember doing anything with the gun other than throwing it away. (Dkt. 7-6 at 21.)

Prior to trial and at the state's expense, defense counsel arranged for Petitioner to be examined by Dr. Richard Worst, a psychiatrist. (Dkt. 5-1 at 1.) Just three weeks before trial, Petitioner's counsel notified the state that Petitioner would be calling Dr. Worst to testify for the defense, and the prosecution objected. (*Id*. at 1-2.) The trial court determined that Dr. Worst would be allowed to testify as to Petitioner's mental state at the time of the shooting, but that Petitioner would have to disclose Dr. Worst's reports to the state and submit to an examination by a state psychologist. (*Id*. at 2.) The court postponed the trial and ordered that any evidence gained through this second examination could be used by the prosecution only in rebuttal. (*Id*. at 2 & n.1.) The judge also warned Petitioner that he had a constitutional right to remain silent if asked about the events surrounding the shooting and that "any incriminating statements he [made] to the State's experts could be used against him at trial, in the event defendant place[d] his mental status in issue at trial." (*Id*. at 3 n.1.) Dr. Robert Engle evaluated Petitioner on behalf of the state, but ultimately did not testify. (*Id*. at 2-3.)

Petitioner's defense at trial was that Hooten threatened to kill him and that Petitioner defended himself. (Dkt. 7-6 at 16; Dkt. 7-7 at 1-2.) Petitioner also stated that he did not know where precisely Peak was when he fired the last shot: "It was such a blur. It was so fast. I knew they were both coming and I didn't know where they were. I knew

**MEMORANDUM DECISION AND ORDER - 11**

they were there." (Dkt. 7-7 at 2.)

On cross-examination of Petitioner, the prosecutor asked Petitioner questions based on statements he had made to Dr. Worst, Petitioner's psychiatrist and expert witness. (Dkt. 7-6 at 26; Dkt. 7-7 at 1.) Petitioner identifies three questions asked by the prosecutor that allegedly violated his Fifth Amendment right against compelled self-incrimination.[2] (Traverse at 42.) The prosecutor asked Petitioner: (1) "[T]he first shot was straight up in the air, is that what you told Dr. Worst?" (Dkt. 7-6 at 26); (2) "But didn't you tell Dr. Worst that in-between each one of those shots Marshall Hooten kept coming after you and kept yelling at you?" (Dkt. 7-7 at 1); and (3) "[Y]ou told Dr. Worst that you were devastated when that shot hit Marshall Hooten, did you not?" (Dkt. 7-7 at 1). Petitioner answered all of these questions in the affirmative.

Notably, at the time of the prosecutor's questions, Petitioner had already testified on direct examination as follows:

> And [Hooten] came up to me and he said, "What are you going to do, shoot me?" And I said, "Just stay the fuck away from me." And he said, "Come on, fucking shoot me." And he was flailing his arms like this (indicating), and he was doing this (indicating) and he was going to his chest. And he came right up to me and he said, "Come on." And I said, "Stay the —" I kept telling him, "Stay away from me. Just go." And he said, "I'm going to pound your fucking face and you're going to die, motherfucker." *I fired a shot in the air*, and I said, "Stay away from me." And I fired another one in

---

[2] Though the prosecutor asked other questions about Petitioner's statements to Dr. Worst, these three are the only questions challenged in Petitioner's briefing.

**MEMORANDUM DECISION AND ORDER - 12**

> the ground, I said, "Stay away." And he kept coming. He said,
> "Come on fucker." I said, "Just go, stay away from me." I
> fired another shot in the ground, *and he just kept coming* and
> he was right on me, and I fired to stop him. And I saw the
> other guy and I fired at the other guy.

(Dkt. 7-6 at 17) (emphases added). Petitioner had also testified on direct that he did not

intend to kill Hooten or Peak when he fired the shots. (*Id*. at 18.)

With respect to Petitioner's mental state, Dr. Worst testified "to a reasonable

degree of medical certainty" that at the time of the shooting, Petitioner was suffering from

acute stress disorder. (Dkt. 7-7 at 7.) Dr. Worst explained acute stress disorder as

> a psychological reaction to a terrifying event in which the
> individual is so terrified and in such fear of their life that they
> lose their normal psychological faculties. They lose their
> ability to be rational, to process, to problem solve, to control
> their behavior, to control their emotions. It's a very powerful
> reaction to an event that is so terrifying that the average
> person would agree.

(*Id*.) Dr. Worst testified that Petitioner was in a state of dissociation when he shot Hooten

and Peak and that "it was one overwhelming, traumatic experience." (*Id*. at 8.)

The January beating was one of several pieces of information that Dr. Worst relied

on in arriving at the conclusion that Petitioner suffered from acute stress disorder. (*Id*. at

11.) Dr. Worst testified on cross-examination that the January beating was "self-

reporting," meaning that the only evidence of the attack was Petitioner's own account.

(*Id*.) The prosecutor attempted to call into doubt Dr. Worst's diagnosis by asking him

whether he knew that "the police in that particular case [the January beating] went to

**MEMORANDUM DECISION AND ORDER - 13**

[Petitioner's] house, looked at him, examined him, and didn't find his alleged injuries consistent with his report?" (*Id*.) Dr. Worst stated that he had not known that, but that he believed Petitioner had described "his reality as he perceived it." (*Id*.) Petitioner's counsel did not attempt to introduce the medical report from Dr. Haisley, nor did counsel call Dr. Haisley as a witness to testify as to the extent of Petitioner's injuries sustained in the January attack.

Petitioner was convicted of both counts of attempted murder. The following exchange then took place in front of the jury:

| | |
|---|---|
| The Court: | There's one other matter, members of the jury, I need to take up before I discharge you. There is an enhancement on these charges under Idaho Code. |
| | Mr. Roark [defense counsel], you indicated Mr. Santistevan was prepared to admit that—in the event he was found guilty, that he would admit that a firearm was used, displayed, threatened or attempted to be used in the commission of the crime? |
| Mr. Roark: | That is correct, Your Honor. |
| The Court: | And, Mr. Santistevan, I have to ask you if you're prepared to make that admission? |
| [Petitioner]: | I defended myself. These guys came looking for me. I didn't cause this. How could this be? |
| . . . . | |
| The Court: | Do you wish to present any additional evidence? |
| Mr. Roark: | No, Your Honor. Mr. Santistevan is on record under oath testifying before the jury that he, indeed, did use a firearm, so |

**MEMORANDUM DECISION AND ORDER - 14**

> I think, quite clearly, on the enhancement portion of the information the State's evidence is sufficient.

The Court: And I appreciate that, however, under the U.S. Supreme Court cases of late, the jury must make a finding or there has to be an admission. And if Mr. Santistevan can't make that admission, I'm going to reinstruct the jury and send them back out.

(Dkt. 7-7 at 29.)

Petitioner was then removed from the courtroom after an outburst. The jury deliberated and found that Petitioner did use a firearm in the commission of the offense. (*Id.* at 30.)

## 3.    Analysis of Claims A-1, A-2, and A-5: Ineffective Assistance of Counsel

The standard for ineffective assistance of counsel claims was identified in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the "reasonableness" of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse

**MEMORANDUM DECISION AND ORDER - 15**

sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as which evidence to present or which witnesses to call, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

**MEMORANDUM DECISION AND ORDER - 16**

*Id.* at 690-91.

The Ninth Circuit has provided some insight into the *Strickland* standard when evaluating an attorney's "strategy calls." These cases are instructive in the Court's assessment of whether the Idaho Supreme Court reasonably applied *Strickland. See Duhaime*, 200 F.3d at 600. First, a questioned tactical decision is not tantamount to ineffective assistance simply because in retrospect better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to trial tactics does not constitute denial of effective assistance. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).

If a petitioner is able to show that counsel's performance was deficient, the next step is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As the *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated,

**MEMORANDUM DECISION AND ORDER - 17**

> trivial effect. Moreover, a verdict or conclusion only weakly
> supported by the record is more likely to have been affected
> by errors than one with overwhelming record support. Taking
> the unaffected findings as a given, and taking due account of
> the effect of the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the defendant has
> met the burden of showing that the decision reached would
> reasonably likely have been different absent the errors.

*Id.* at 695-96.

When evaluating a claim of ineffective assistance of counsel in a federal habeas proceeding under § 2254(d)(1), the Court's review of that claim is "doubly deferential." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011).

### A.   *Claim A-1: Trial Counsel's Concession of Guilt on Firearm Enhancement Charge*

Petitioner claims that his trial counsel rendered constitutionally deficient performance by conceding, after the jury returned the guilty verdicts on the attempted murder charges but before deliberation on the sentencing enhancement charge, that Petitioner had used a firearm during the incident. However, Petitioner himself admitted on the witness stand that he shot the two boys with his gun. (State's Lodging E-1 at 453-54.) There was never any question as to that fact. Petitioner's defense theory was that he used a gun to defend himself, not that he did not use a gun at all. There is no conceivable prejudice arising from any alleged error in counsel's statements, and the Idaho Court of Appeals reasonably applied *Strickland* when it rejected Petitioner's argument. Therefore, Petitioner is not entitled to relief on Claim A-1.

**MEMORANDUM DECISION AND ORDER - 18**

B.    *Claim A-2: Trial Counsel's Failure to Introduce Medical Evidence of the January Attack*

Petitioner next claims that counsel was ineffective for failing to call Dr. Haisley or to introduce her medical report regarding the injuries suffered by Petitioner at the Silver Dollar Bar in January 2004.

On review of Petitioner's state postconviction petition, the Idaho Court of Appeals held that trial counsel's failure to call Dr. Haisley or to introduce her report was a strategic decision and that Petitioner had failed to meet his burden of establishing that his counsel's performance was deficient:

> Decisions about what witnesses to call and what evidence to introduce at trial are generally matters of trial tactics or strategy. *State v. Payne*, 146 Idaho 548, 563, 199 P.3d 123, 138 (2008); *Bagshaw v. State*, 142 Idaho 34, 38, 121 P.3d 965, 969 (Ct. App.2005); *Drapeau v. State*, 103 Idaho 612, 616, 651 P.2d 546, 550 (Ct. App.1982). Such tactical or strategic decisions of trial counsel will not be second-guessed unless they were based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *Baxter v. State*, 149 Idaho 859, 863, 243 P.3d 675, 679 (Ct. App.2010); *Howard v. State*, 126 Idaho 231, 233, 880 P.2d 261, 263 (Ct. App.1994). A post-conviction petitioner must overcome a strong presumption that counsel's performance fell within the wide range of acceptable professional assistance. *Payne*, 146 Idaho at 561, 199 P.3d at 136; *State v. Hairston*, 133 Idaho 496, 511, 988 P.2d 1170, 1185 (1999).

> The decision of [Petitioner's] attorney to not present medical evidence of some marks on his body is a tactical decision of the sort that will not be deemed deficient performance absent a showing that it was based upon inadequate preparation, ignorance of the law, or other

**MEMORANDUM DECISION AND ORDER - 19**

objectively identifiable shortcomings. [Petitioner] has made no such showing to create a genuine issue as to whether his counsel was deficient. Rather, [Petitioner] attached the report to his petition and stated in a conclusory manner that the evidence was "vital" to his self-defense claim. However, his argument on appeal and below show that *the evidence was actually quite tangential to the self-defense issue*. It would have corroborated only a portion of his story that had nothing to do with self-defense but, as stated by [Petitioner], merely explained why he was in the alleyway where the altercation started. The State's witness that he contends this evidence would have discredited [Sergeant Fruehling] did not testify on a topic relevant to [Petitioner's] self-defense claim, but rather on the topic of this alleged prior beating and the reasons why the officer did not pursue charges or investigate. Even if the evidence would have discredited the officer's veracity in a general way, *counsel would have had to weigh the usefulness of that potential and make a tactical decision whether it would materially advance the defense*. Because [Petitioner] has shown no reason to believe that this tactical decision was objectively unreasonable or based on ignorance of law or lack of preparation, this claim was properly dismissed.

(Dkt. 6 at 6-7) (emphasis added).

The state appellate court's decision was consistent with a reasonable application of *Strickland*. The record is insufficient to establish that trial counsel's decision not to call Dr. Haisley or to introduce her report fell so far below an objective standard of reasonableness that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Dr. Haisley's testimony and medical report would have bolstered Dr. Worst's testimony and the acute stress disorder defense. However, the totality of the evidence shows that the medical evidence had only marginal probative value. The report does not

**MEMORANDUM DECISION AND ORDER - 20**

suggest that Petitioner's abrasions, swelling, and bruising were especially severe. And Petitioner's testimony that he was in the alley to gather information about the previous beating was already corroborated by Petitioner's green notebook, which Petitioner said he was using that night and which police found at the scene of the shooting. (Dkt. 7-6 at 21.) The double deference that applies when reviewing ineffective assistance claims in habeas proceedings leaves no room for this Court to second-guess the tactical decision of Petitioner's counsel with the benefit of hindsight. *Pinholster*, 131 S. Ct. at 1403; *Strickland*, 466 U.S. at 689. Thus, Petitioner has not shown that his counsel performed deficiently.

Furthermore, Petitioner has not shown a reasonable probability that he was prejudiced by his attorney's decision not to present the medical evidence. Petitioner concedes that "Dr. Haisley's testimony and her medical report may not bear directly on one particular element of the State's case," but argues that the evidence "did inform the self-defense issue and would have rebutted the attacks on [Petitioner's] testimony and credibility." (Traverse at 10-11.) But while the medical evidence would have corroborated Petitioner's self-report of the January beating, that evidence would have been countered by Petitioner's admission at trial that he told Sergeant Fruehling the January attack was "more of a psychological beating" than a physical one." (Dkt. 7-6 at 20.)

In addition, Dr. Haisley's testimony and medical report could have impeached Sergeant's Fruehling's testimony with respect to the January attack, as the court of

**MEMORANDUM DECISION AND ORDER - 21**

appeals noted. However, the only aspect of Fruehling's testimony the medical evidence might have have called into question was Fruehling's stated reason for not filing charges relating to the January beating, which has nothing to do with the shooting of Hooten and Peak. The report would have shown, at most, that Petitioner's injuries from the January attack were not as minor as Fruehling believed.

With respect to shoring up Petitioner's testimony and credibility, the benefit that arguably might have been gained from the medical evidence pales in comparison to the evidence casting doubt on Petitioner's side of the story. When Sergeant Fruehling told Plaintiff he would likely not file any charges regarding the January beating because Petitioner did not have a mark on him, Petitioner asked Fruehling what would happen if Petitioner just went down to the bar and started shooting. (Dkt. 7-3 at 21.) Though Petitioner confirmed Fruehling's testimony as to the content of nearly all of their conversation, he testified that he did not remember asking Fruehling that particular question. (Dkt. 7-6 at 20.) But the fact of,  and the extent of any, physical injuries he had in January would not have rehabilitated Petitioner's credibility on this point.

Petitioner's actions after the shooting also support the prosecution's theory that, rather than shooting the victims in self-defense, Petitioner was not in fear for his life and intended to kill them when he shot them. Peak was riding *away* from Petitioner when Petitioner shot him. Although Hooten fell to the ground after being shot in the gut and thus posed no threat to Petitioner, Petitioner did not check to see if he was alive. (Dkt. 7-7

**MEMORANDUM DECISION AND ORDER - 22**

at 21.) Petitioner did not call the police or an ambulance, but instead went home and had a "normal" evening with his girlfriend April Kildare, during which he had sex and drank tea. (*Id*.) Kildare testified that Petitioner said nothing to her about having just shot two boys in self-defense and that he was acting normally that night. (Dkt. 7-4 at 13.) Petitioner also initially lied to the police and said he did not know anything about the shooting. Such are not the actions of a man who believed he was justified in using deadly force. The evidence of Petitioner's intent in attempting to kill his victims was overwhelming, and it is no surprise that the jury rejected Petitioner's story. The Idaho Court of Appeals reasonably denied Petitioner relief on Claim A-2.

C.   ***Claim A-5: Counsel's Failure To Advise Regarding a Petition for Review and Failure To Preserve an Alleged Due Process Error at Sentencing***

Claim A-5 alleges that defense counsel failed to file a petition for review from the decision of the Idaho Court of Appeals or to preserve an alleged due process error at sentencing.[3] As the state court reasonably held, citing the U.S. Supreme Court's decision in *Ross v. Moffitt*, there is no constitutional right to the effective assistance of counsel on discretionary review of an appellate decision. (Dkt. 6 at 5.) *See Ross v. Moffitt*, 417 U.S. 600, 610 (1974) ("We do not believe that the Due Process Clause requires North Carolina to provide respondent with counsel on his discretionary appeal to the State Supreme Court."). (*See* Dkt. D-6 at 5-6.)

---

[3] Petitioner offers no description or explanation as to this alleged sentencing error.

**MEMORANDUM DECISION AND ORDER - 23**

Moreover, even assuming that appellate counsel should have filed a petition for review, Petitioner alleges only generally that he was prejudiced by any such error. Petitioner states that counsel should have informed him about the option of petitioning for review, that Petitioner "had issues he wanted to bring on direct appeal that would have added context to the two claims trial counsel raised on appeal," and that his counsel's failure to "includ[e] the other issues [Petitioner] wanted to [raise] prejudiced him and rise to the level of a violation of his Sixth Amendment right to effective assistance of counsel." (Traverse at 12.)

First, one cannot raise in a petition for review any new issues that were not raised in the initial appellate briefing. Second, Petitioner does not state how the failure to raise any other issues prejudiced him. He does not even identify those other issues, except with respect to his vague assertion of a "due process error at sentencing." (Am. Pet. at 12.) In short, Petitioner has not met his heavy burden of showing that the Idaho Court of Appeals' decision rejecting Claim A-5 was an unreasonable application of *Ross* or *Strickland*.

**4.     Analysis of Claim B: Fifth Amendment Right To Be Free from Compelled Self-Incrimination**

Petitioner argues that his Fifth Amendment rights were violated by three separate events: (1) the court's order compelling him to submit to a psychiatric examination; (2) the requirement that he disclose to the prosecution Dr. Worst's report; and (3) the prosecutor's cross-examination of Petitioner based on his statements to Dr. Worst. (Dkt.

**MEMORANDUM DECISION AND ORDER - 24**

25 at 14.

The Fifth Amendment to the United States Constitution provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Every criminal defendant has a right not to testify, and a jury may not draw an adverse inference from a defendant's choice not to testify.

However, when a defendant *does* testify, he or she may not elect to answer some questions and assert the Fifth Amendment privilege with respect to others:

> Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf and makes his own statement, it is clear that the prosecution has a right to cross-examine upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.

*Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900).

The Fifth Amendment applies to situations involving compelled mental examinations. In *Estelle v. Smith*, 451 U.S. 454, 456-57 (1981), the trial court ordered the defendant to undergo an examination for purposes of determining whether the defendant was competent to stand trial. The defendant was found competent, proceeded to trial, and was convicted of murder. During the capital sentencing phase of the trial, the prosecutor called the doctor who had examined the defendant for competency and whose report

**MEMORANDUM DECISION AND ORDER - 25**

identified the defendant as "a severe sociopath." *Id*. at 458-59. The doctor testified that, in his opinion, the defendant had no regard for other human beings or their property and would continue his criminal behavior in the future. (*Id*. at 459-60.) The defendant was sentenced to death.

The Supreme Court held that the admission at the penalty phase of the examining doctor's testimony and report violated the defendant's Fifth Amendment privilege against compelled self-incrimination because the prosecutor "used [the defendant's] own statements, unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty." (*Id*. at 466.) The Court distinguished the case from lower court cases approving court-ordered mental evaluations where the defendant puts his mental status at issue: "When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case." *Id.* at 465.

The Supreme Court returned to the issue in *Buchanan v. Kentucky*, 483 U.S. 402 (1987). There, the prosecutor and the defense attorney had jointly requested a mental evaluation for purposes of determining whether the defendant should be involuntarily hospitalized. *Id*. at 404, 410-11. At trial, the defendant asserted the affirmative defense of extreme emotional disturbance. *Id*. at 408. On direct examination by defense counsel, a social worker who had been assigned to the defendant read into evidence "several reports

**MEMORANDUM DECISION AND ORDER - 26**

and letters dealing with evaluations of [the defendant's] mental condition." *Id*. at 409.

On cross-examination, the prosecutor asked the witness to read from a different report, one prepared by the psychologist who had examined the defendant to determine whether he should be hospitalized. The defense objected, and the prosecutor argued that the report dealt with the same subject matter that the defendant had elicited from the social worker on direct examination. The court allowed the social worker to read from the report. *Id.* at 412.

In holding that this cross-examination of the social worker did *not* violate the Fifth Amendment, the Court explained that *Estelle* involved a defendant who "neither placed at issue [his] competency to stand trial nor had offered an insanity defense." *Id.* at 421. The Court held that "if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation *with evidence from the reports of the examination that the defendant requested*." *Id.* at 422-23 (emphasis added). The Court noted that the report that was read into evidence was based solely on the doctor's general observations of the defendant; the report did not describe any statements by the defendant "dealing with the crimes for which he was charged. The introduction of such a report for this limited rebuttal purpose does not constitute a Fifth Amendment violation." *Id.* at 423-24.

The Supreme Court recently made clear that *Buchanan* is not limited to situations where the prosecution and defense jointly request a mental evaluation of the defendant.

**MEMORANDUM DECISION AND ORDER - 27**

*Kansas v. Cheever*, 134 S. Ct. 596, 301 (2013). In *Cheever*, the defendant filed a notice that he intended to introduce expert testimony "relating to his intoxication" on the day he killed the victim. In response, the federal district court presiding over the trial ordered the defendant to submit to a psychiatric evaluation. *Id*. at 599. After the charges were dismissed without prejudice as a result of defense counsel's unavailability, the defendant was charged in state court. The defendant presented the testimony of a specialist in psychiatric pharmacy, who opined that the defendant's methamphetamine use had damaged his brain and that on the day of the crime, the defendant had been "very much influenced" by his use of the drug. *Id*. at 600. In rebuttal, the state called the expert who had earlier examined the defendant by order of the federal court. The trial court allowed the testimony "for the purpose of showing that [the defendant] shot [the victim] 'because of his antisocial personality, not because his brain was impaired by methamphetamine.'" *Id*.

The Court held that the rebuttal evidence did not violate the Fifth Amendment: "The rule of *Buchanan*, which we reaffirm today, is that where a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal. Any other rule would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime." *Id*. at 601.

**MEMORANDUM DECISION AND ORDER - 28**

The claim that Petitioner raised to the Idaho Court of Appeals was that the compelled psychiatric examination by Dr. Engle, by itself, violated his right not to incriminate himself. *Cheever* had not been decided at the time the Idaho Court of Appeals rejected that claim. The Idaho Court of Appeals held:

> Although neither the United States Supreme Court nor the Idaho appellate courts have directly addressed the issue, virtually all federal circuit courts and state appellate courts considering the matter have held that if a defendant announces and intention to introduce psychiatric evidence to support a claim of mental defect, a court-ordered mental examination of the Defendant by an expert for the State does not violate the privilege against self-incrimination. While the grounds for the decisions vary, the overarching rationale can be described as one of fundamental fairness and judicial common sense, taking practical considerations into account in determining the reach of the Fifth Amendment privilege against self-incrimination. . . . *[W]hen a defendant introduce[s] psychiatric testimony to show why he should not be punished for a crime, the state must be able to follow where he has led. To hold that the Fifth Amendment prevents a compelled examination in this circumstance would deprive the State of the only adequate means to meet the defense expert's testimony.*

(Dkt. 5-1 at 4-5) (emphasis added) (internal quotation marks and citations omitted).

The decision of the Idaho Court of Appeals was a reasonable application of *Estelle* and *Buchanan*. Indeed, *Cheever* has now made clear that when a defendant seeks to introduce evidence of his mental state, a court may order the defendant to undergo a psychiatric evaluation by a state expert so that the state may rebut defendant's psychiatric evidence. Thus, the state court's decision was not based on an unreasonable application of

**MEMORANDUM DECISION AND ORDER - 29**

Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

The other two aspects of Petitioner's Fifth Amendment claim—regarding the disclosure of Dr. Worst's report and the cross-examination of Petitioner—fail for two reasons. First, in state court Petitioner expressly waived his argument that the state should not have cross-examined Petitioner with the statements he made to Dr. Worst. Defense counsel stated to the trial court that "whatever [Petitioner has] told Dr. Worst *is waived in terms of privilege*." (Dkt. 7-2 at 8) (emphasis added).

Second, these two arguments fail on the merits. With respect to the disclosure of Dr. Worst's report to the state and the prosecutor's cross-examination of Petitioner based on that report, this case falls into the gap between *Estelle* on the one hand, and *Buchanan* and *Cheever* on the other. Petitioner was ordered to undergo an examination with state psychologist Dr. Engle, like the defendant in *Estelle*. But unlike the defendant in *Estelle*, Dr. Engle did not testify, and Petitioner himself had put his mental state at issue by introducing evidence that he suffered from acute stress disorder at the time of the crimes. *Cheever* instructs us that the prosecution was entitled to counter Petitioner's evidence of his mental state.

The Court concludes that Petitioner was not deprived of his Fifth Amendment right against compelled self-incrimination. The primary factor supporting that conclusion is that Petitioner took the stand. Petitioner put his mental status at issue by calling Dr. Worst, and he also waived his privilege not to testify. The holding of *Fitzpatrick* allows

**MEMORANDUM DECISION AND ORDER - 30**

cross-examination of a defendant to the same extent as cross-examination of any other witness. Further, the prosecutor did not use any of Dr. Engle's reports at all in questioning Petitioner (even though, under *Cheever*, the state could have done so in rebuttal); the questions were entirely based on Petitioner's statements to Dr. Worst during the evaluation that Petitioner himself requested.

In summary, the Fifth Amendment privilege against self-incrimination does not allow a defendant to have his cake and eat it too. Petitioner put his mental status at issue and testified in his own defense. Therefore, the state was not required to stand mute.[4]

## 5. Cumulative Error

Petitioner asserts that even if none of his individual habeas claims entitle him to relief, his petition should nonetheless be granted because, taken together, the errors in his trial constitute prejudicial cumulative error. The Court rejects this argument. "While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Payton v. Cullen*, 658 F.3d 890, 896-97

---

[4] The Court also concludes that even if Petitioner's Fifth Amendment rights had been violated by the disclosure of Dr. Worst's report or the prosecutor's resulting cross-examination, Petitioner cannot show that any such error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). The three questions from the prosecutor to which Petitioner objects could not have contributed in any way to the guilty verdicts. Petitioner himself had already testified (on direct examination) that (1) he fired the first shot in the air; (2) Hooten kept coming at Petitioner while he was firing warning shots; and (3) he did not intend to kill Hooten. Thus, the jury had already heard his answers to the prosecutor's questions about the trajectory of the first shot, Hooten's approach toward Petitioner, and how Petitioner felt when he shot Hooten. That Petitioner also made these statements to Dr. Worst and that the prosecutor learned of them via Worst's expert report does not alter the *Brecht* inquiry.

**MEMORANDUM DECISION AND ORDER - 31**

(9th Cir. 2011). Petitioner has simply not established that his trial was rendered fundamentally unfair.

## CONCLUSION

Petitioner was not denied his Sixth Amendment right to effective assistance counsel or his Fifth Amendment right to be free from compelled self-incrimination. Because Petitioner's other claims have been dismissed as procedurally defaulted, the Court will deny the habeas petition and dismiss this case.

## ORDER

**IT IS ORDERED:**

1.   Petitioner's Second Motion to Extend Time to File Traverse (Dkt. 38) is GRANTED.

2.   Petitioner's Amended Second Motion to Extend Time to File Traverse (Dkt. 41) is GRANTED. Petitioner's Traverse (Dkt. 42) is deemed timely.

3.   The Amended Petition for Writ of Habeas Corpus (Dkt. 25) IS DENIED, and this entire action is DISMISSED with prejudice.

4.   The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of

**MEMORANDUM DECISION AND ORDER - 32**

Appeals for the Ninth Circuit. Petitioner may seek a certificate of

appealability from the Ninth Circuit by filing a request in that court.



DATED: **January 9, 2014**

Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 33**